177 So. 890

**HOME INS. CO. v. SHRINER et al.**

**ÆTNA INS. CO. v. SAME.**

I Div. 923, 925.

Supreme Court of Alabama.

Dec. 2, 1937.

Rehearing Denied Jan. 13, 1938.

F. W. Davies and Coleman, Spain, Stewart & Davies, all of Birmingham, for appellants.

Beebe, Hall & Beebe, of Bay Minette, for appellees.

FOSTER, Justice.

This litigation arose out of a fire which occurred on August 4, 1929, at Summerdale, in Baldwin county, in which a stock of merchandise was completely destroyed. The suits were consolidated and removed into equity, resulting in a judgment on two policies against the Home Insurance Company, and on one policy against the Ætna Insurance Company, and in favor of the Providence-Washington Insurance Company.

The principal of the policies issued by the Home was $3,500, and that of the policy issued by the Ætna was $2,500, making the total principal adjudged by the court of $6,000 of contracted insurance. The controversy as to the Providence-Washington was that it had also an outstanding policy of $2,500, thereby increasing the amount over that allowed in the Home and Ætna policies. The controversies in respect to the liability of the Home and Ætna are thus expressed by their counsel in brief:

"1. That the property was wilfully burned through the design or procurement of the assured.

"2. That the Iron-Safe Clause of the policy had been breached in that the assured failed to keep a set of books as required by the policy and failed to keep them securely locked in a fireproof safe at night, and as a result thereof, said books were totally destroyed by fire and that the assured failed to produce his books and records after the fire.

"3. That at the time of the fire the assured had a total insurance of $8500.00, whereas the policy only allowed a total insurance of $6000.00, and by the terms and provisions of the policies, all of the policies became null and void on account of this fact.

"4. That the assured was not the sole and unconditional owner of the property at the time of the fire, in that the respondent, M. S. Holley, had an interest in the insured property."

## Arson.

So that the first contention is that insured Shriner procured the stock of goods to be voluntarily burned. The evidence shows that Elmer Resmondo and Robert Brown, maybe with the help of brothers of Resmondo, set fire to and burned the store about 10 o'clock on Sunday night August 4, 1929. They or some of

them had burglarized the store and carried off a lot of the goods and hid them behind an old barn. Elmer and Robert pleaded guilty to the charge, and received a sentence. They had been working together at a clearing of land, and at spare times stole chickens and pigs and sold liquor. They pleaded guilty to stealing and served some time, and both were in prison when they testified at different times. Elmer testified that Shriner told him to see one Reynolds at Foley, his lawyer, who had a job for him. That he and Brown went to see Reynolds, who agreed to give them $25 each to burn up the store pursuant to his plans. After the fire they went to Florida, and were brought back and put in jail, and found Reynolds in jail on a charge of defrauding or something of the sort. Reynolds denied that he had any connection with the matter or that he knew or ever met Shriner. He was no lawyer, but a rather smart fellow, and turned preacher in jail.

The boys seem to have first told about it to the solicitor and sheriff without implicating Reynolds and Shriner. Later they implicated them as stated above.

Shriner had been principal of the school, and Elmer was a student before Shriner went into this business. Shriner was very clear and emphatic that he had never known Reynolds until he saw him in court. (Such was Reynolds' evidence.) Also that he made no such arrangement with him or with Elmer about the burning, and had no previous knowledge of it.

On the night of the fire Shriner was at a drugstore, after the picture show, when a man asked him and the druggist to go with them to a church nearby to investigate some unusual noise. As they returned, they all saw the smoke about the same time.

The evidence was overwhelming that Shriner had an excellent character, and that Elmer Resmondo and Robert Brown were most disreputable and unreliable. Their evidence is not corroborated by any other witness nor circumstance. We think the evidence does not support the charge that Shriner caused or procured the property to be burned.

### Iron-Safe Clause.

The clause here in question is quoted as follows:

"1. The assured will take a complete itemized inventory of stock on hand at least once in each calendar year and, unless such inventory has been taken within twelve calendar months prior to the date of this policy, one shall be taken in detail within thirty days of issuance of this policy, or this policy shall be null and void from such date, and upon demand of the assured the unearned premium from such date shall be returned.

"2. The assured will keep a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit, from date of inventory, as provided for in first section of this clause, and during the continuance of this policy.

"3. The assured will keep such books and inventory, and also the last preceding inventory, if such has been taken, securely locked in a fireproof safe at night, and at all times when the premises mentioned in this policy are not actually open for business; or, failing in this, the assured will keep such books and inventories in some place not exposed to a fire which would destroy the property hereby insured.

"In the event of failure to produce such set of books and inventories for the inspection of this company, this policy shall become null and void, and such failure shall constitute a perpetual bar to any recovery thereon."

The evidence shows that Shriner kept in his office in the store an iron safe in which he kept his inventories and books and other papers. He did not keep money in it overnight, but carried that home with him. The safe was rather large, with a heavy outside door, and combination which controlled the operation of the bars and levers which fastened it. Every night, including Saturday before the fire, Shriner put in it his books and papers, fastened the bolt, and turned the knob partially so as not to throw off the combination entirely, but so that it could be moved to one certain number, and then the bars could be released.

The fire originated in an adjoining building, known as a "warehouse," connected with the store where the office was situated, and used as a part of the business where combustible feed was in store. When Shriner reached the office it was full of smoke, and he stumbled on some goods, and saw what appeared to be his books or papers pulled out of the safe.

The safe was apparently broken open by a crowbar, as some of the evidence tends to show. There was so much smoke and confusion nothing of consequence was saved from the fire, and all the books and papers were consumed, and, of course, could not be produced for adjustment of the loss. The policy requires the safe to be securely locked. We think this situation shows that it was so. No one could open it without knowing the number on which to stop the turn of the knob, without prizing or blowing open the door.

But assuming that an expert could have done so, without prizing it open, it was not opened by turning the knob but evidently by prizing it. The manner in which the combination was worked had no proximate effect on the manner in which it was opened on that occasion. Compare Stovall v. Sterling Fire Ins. Co., 163 La. 284, 111 So. 707. The burglars evidently prized open the safe looking for money and then fired the building to hide their crime.

■ The requirement that the safe be fireproof is satisfied by the use of a safe believed by insured to be fireproof, and of the kind commonly sold on the market as such. 26 Corpus Juris, 256, note 46; 3 Cooley on Ins. pp. 2832 and 2838; 5 Couch Cyc. of Insurance Law, p. 3619. And in our case of Hartford Fire Ins. Co. v. Isbell, 218 Ala. 627, 119 So. 834, 836, this court expressed the law applicable to such a case as this, as follows: "It appears to be the law that if plaintiff in good faith provided an iron safe for the keeping of his books, as the contract of insurance required when interpreted as we have indicated (3 Cooley's Briefs [2d Ed.] pp. 2802, 2832), the happening of an event beyond the contract of the insured, as, for example, burglars, in the effort to loot the safe, destroy its integrity to the extent that it is no longer fireproof, and the goods insured and the books of the business are destroyed, such a happening will not deprive the insured of the protection of his policy. Pennsylvania Fire Ins. Co. v. Malone, 217 Ala. 168, 115 So. 156 [56 A.L.R. 1075]."

The same principle is declared in the case of Sneed v. British-America Assur. Co., 73 Miss. 279, 18 So. 928, 929, as follows: "If, in this very case, the insured's fireproof safe had been blown open by cracksmen, and its money contents stolen, and, to cover the crime, or by any agencies resorted to by the burglars, the insured property had been set on fire and consumed, whereby the safe, and the books and inventories contained in it, had been destroyed by the same fire, would any reasonable man hold that the insured would not be excused from producing the books? The true rule must be that, ordinarily, the books must be produced, for, ordinarily, that would be within the power of the person who had undertaken such production; but the complement of this rule must be true also, viz. that an extraordinary and unforeseen conjuncture of circumstances, which puts the production of the books beyond the reach of the insured, without fault on his part, must relieve from the performance of an impossible act."

■ The keeping of books and inventories and their preservation in a fireproof safe, and their production for use in adjustment by the insurer, all are features of the same requirement, and are for the same purpose. The stipulation is liberally construed in favor of insured and against the insurer. London Assur. Corp. v. Poole, 212 Ala. 109, 101 So. 831; 5 Couch Cyc. of Insurance Law, § 1024; Georgia Home Ins. Co. v. Allen, 119 Ala. 436, 24 So. 399.

■ It is a promissory warranty in the nature of a condition subsequent. London Assur. Corp. v. Poole, supra; Chamberlain v. Shawnee Fire Ins. Co., 177 Ala. 516, 58 So. 267; Fidelity-Phoenix Ins. Co. v. Williams, 200 Ala. 678, 77 So. 156.

■ Its purpose is said to prevent a fraudulent or erroneous claim in amount of the loss, and an aid in making adjustment. Pennsylvania Fire Ins. Co. v. Malone, 217 Ala. 168, 115 So. 156, 56 A.L.R. 1075.

■ A substantial breach of its material features relieves insurer from liability in respect to those features of the policy intended to be included in its requirements. If the books and inventories were burned at a time when due diligence was used to comply with the requirement as to keeping them in an iron safe, and without the fault or negligence of insured, he would be excused from producing them for use in making the adjustment. If no such books and inventories, as is required by the policy, were kept, the loss of those which were burned in the fire was not the only factor responsible for the nonproduction of proper books and inventories.

If they did not exist the warranty was not kept, and the fire was not an excuse for such breach. So that under the terms of the policy there can be no recovery if the books were not made up as required by it, though such as were made were burned without fault of insured.

■ The requirement as to books and inventories is to be given a reasonable construction and application, and is satisfied if they are such as that an ordinary person familiar with the system or method employed can ascertain from such records of the business with reasonable certainty the amount and value of the property lost which was insured. Pennsylvania Fire Ins. Co. v. Malone, supra; Western Assur. Co. v. McGlathery, 115 Ala. 213, 224, 22 So. 104, 67 Am.St.Rep. 26; Fidelity-Phoenix Ins. Co. v. Williams, 200 Ala. 678, 77 So. 156; Mississippi Fire Ins. Co. v. Perdue, 217 Ala. 292, 116 So. 142, 62 A.L.R. 626; 3 Cooley's Briefs on Ins. p. 2821; 5 Couch on Insurance, 3593, § 1032.

It was held in Hartford Fire Ins. Co. v. Isbell, supra, that if the books show the items of credit sales and the amounts collected from cash sales, but not the specific goods sold for cash, they were sufficient in that respect. So also in Mississippi Fire Ins. Co. v. Perdue, supra, London Assur. Corp. v. Poole, supra.

■ Parol evidence is admissible to explain the system employed and identify the books relating to the business. Mississippi Fire Ins. Co. v. Perdue, supra; Pennsylvania Fire Ins. Co. v. Malone, supra.

When the records show that an inventory was made, as required, and entry of invoices on the books or their preservation showing a general description of the goods purchased, and the books show separately credit and cash sales and collections made since the inventory, it was held that they sufficiently comply with the policy requirement in question, when the credit sales show the articles sold and the name of the purchaser, though the cash sales show neither. London Assur. Corp. v. Poole, supra; 14 R.C.L. 1141, note 2; 3 Cooley's Briefs on Ins. p. 2823.

■ The contract requires that an inventory be made each calendar year, and be made in thirty days after the issuance of the policy unless it has been made in twelve months before, and the books must show purchases and sales for cash and credit, but has no requirement as to invoices. An "inventory" means a list made by a merchant of goods in his store. Day v. Home Ins. Co., 177 Ala. 600, 58 So. 549, 40 L.R.A.,N.S., 652; Insurance Co. of N. A. v. Williams, 200 Ala. 681, 77 So. 159.

■ The evidence shows that Shriner made an inventory the first part of 1929 in compliance with that feature of the requirement, and kept it in his safe with his other books and papers. He also says he kept a set of books showing accounts payable, accounts receivable, and a cashbook, and kept a separate record of credit and cash sales. The cash sales did not show the article sold, nor name of the purchaser, and were 90 per cent. of all his sales. The credit sales were made on slips at the time and carried to the office. Whether they were transcribed to the books is not very clear. But in several places it is emphasized that the books showed a complete record from day to day, and that the credit and cash sales were kept separately. That was a sufficient compliance. Taking it all together, the iron-safe and book requirement did not relieve the insurers from liability. London Assur. Corp. v. Poole, supra.

### Overinsurance.

The evidence as to overinsurance was that at the time of the fire he had insurance without question, as follows:

Home, $1,000, issued October 23, 1928.
Home, $2,500, issued May 5, 1929.
Ætna, $2,500, issued April 29, 1929.

The claim of those companies is that their policies limited the total amount of insurance to $6,000, and that in addition to them he had another policy with Providence-Washington for $2,500, dated April 29, 1929, making a total of $8,500.

■ The provision in the policies is that additional or overinsurance will avoid them whether such additional insurance is valid or not. But that does not apply to a policy which has never become effective by acceptance or other contract. 26 Corpus Juris, 262, § 327. After a policy not void on its face has become effective, the fact that it may be avoided by some breach or other matter not so appearing, will not prevent the forfeiture of the other policies. Phoenix Ins. Co. v. Copeland, 90 Ala. 386, 8 So. 48; Ins. Co. of N. A. v. Williams, 200 Ala. 681, 77 So. 159; 26 Corpus Juris 261.

The evidence in that connection shows that prior to April 29, 1929, he had three policies all written by the Luther agency at Robertsdale. That he had a friend named Ebert who went into the insurance business at Foley, and called on Shriner and solicited some of his insurance. They saw that the next maturity was that of Providence-Washington maturing April 29, 1929, Shriner told Ebert he could have that coverage in place of that policy. Luther was notified by Shriner, whether before or after he executed a renewal does not clearly appear. Perhaps afterward it was executed, but before its date of issue. All the policies were burned in the fire, but it does not appear whether this policy had been delivered. When it occurred he did not know what policies he had as he left it to the agents, who prepared proofs in which both the Ætna and Providence-Washington were included. He made reports and proofs that the latter policy was outstanding, and entered suit on it, all in reliance on statements by the agents and his attorneys. But he never paid the premiums on it, as he did on the others, and the office record kept by Luther shows in the handwriting of his wife that it was canceled. There is some conflict as to when this was done. Luther died and his wife did not remember when it was done. Shriner is corroborated by Ebert as to the dates and amounts of the two policies. There are circumstances which discredit him, but it could be, as he says, he did not know what the agents had done, since at that season, which was a time when he carried his largest stock in the year, the agents sometimes issued, without express orders, additional insurance to last temporarily, and he did not know what had been done in that respect, and thought best to be in position to claim it if there were such insurance.

This is not wholly inconsistent with his claim that he had not accepted nor paid for a renewal of the policy dated April 29th, in the Providence-Washington. On the trial there was no effort to obtain a judgment on that policy, and the court found that it was not subsisting. Of course if that finding is correct, there was no forfeiture, since it would result from the fact that no such policy was ever effective.

The fact that subsequent to the fire Shriner made claim for the additional insurance is not conclusive on him. He is very much in the position of insured in Cowart v. Capital City Ins. Co., 114 Ala. 356, 22 So. 574, 576, where a policy was taken out without the knowledge of insured, but after the fire he made proof of loss and claimed payment of the same. The court observed: "It would be monstrous to hold, in such case, that his insurance subsequently procured was thereby annulled. Nor does the fact that, after the loss, plaintiff, by the advice of defendant's agent, made proof of loss and claimed payment under the first policy. The loss had then occurred. The rights of the parties had become fixed. The reason of the stipulation against other insurance had ceased. Phoenix Insurance Co. v. Boulden, supra [96 Ala. 609, 11 So. 774]. His action in that regard exerted, and could exert, no influence on the conduct of the defendant, in respect of the creation or continuance of the risk, for the policy had matured by the loss; it had ceased to be, except for the purpose of collection. The moral hazard had ceased to exist. These elements could not be restored by ratification. The plaintiff, discovering the existence of the first policy, taken out in his name, was put in the position of determining the legal rights of the defendant and himself in respect of its collection."

If the insured at the time of the fire does not know that he is overinsured, is ignorant that he is not carrying his proportion of the loss as agreed upon, the fact that there is such unknown to him is not an inducement to him to destroy his property, and not within the purpose of the policy requirement. Phoenix Ins. Co. v. Boulden, 96 Ala. 609, 614, 11 So. 774. When a policy is issued as a substitute for another, which is to be canceled by such substitution, the policy to be canceled does not constitute additional insurance. Benedict v. Security Ins. Co., 147 App.Div. 810, 133 N.Y.S. 165.

When April 29th approached, Shriner procured the Ætna policy. He did not direct a renewal of the Providence-Washington. But the evidence taken all together shows that the agent without his authority executed such a contract, but that Shriner never accepted it as such, or paid or agreed to pay the premium on it. His conduct in respect to it after the fire is not conclusive on him and is useful only as a circumstance material on the question of whether he had received and accepted the policy. We do not think he had the

intention of accepting more than $3,500 in the Home and $2,500 in the Ætna prior to the occurrence of the fire, and that the policies were not breached on account of overinsurance.

### Sole Ownership.

The policies of appellants contain a stipulation that they shall be void "if the interest of insured (in the property) be other than unconditional and sole ownership."

The contention is that N. S. Holley was a silent partner and equally interested as such in the stock of goods insured. This claim is denied outright, and Holley claims no such interest nor the right to share in the insurance, as a beneficial owner, and is not a party plaintiff.

The only question argued on both sides is one of fact, whether Holley was in fact a joint owner by reason of being a silent partner. That is the only one we will consider.

The business had been conducted by H. C. Green, who sold it to Shriner in 1926. No one else negotiated with him for the purchase or participated in the sale, except Shriner. The total consideration was approximately $9,600. Shriner and Holley were close friends and partners in a produce business, not in any manner connected with the mercantile business at any time. Holley lived in the home with Shriner and his mother and brother. Other members of the family are not stated. Holley was the agent of the railroad which operated there. He and Shriner owned some real estate jointly and Shriner's mother owned the home.

The evidence is that Shriner borrowed $3,000 from the bank on the mortgage security of their jointly owned property with Holley, a comaker. This money was paid on the purchase of the business. Shriner's mother executed a mortgage on her property to Green to secure two notes as a part of the purchase money; one for $2,500, and one for $2,700. Shriner paid in cash to Green the balance, using in part some of the partnership money of Shriner and Holley. Holley testified that it was a loan. The only foundation for the claim that Holley furnished any part of the purchase price was his signature to the note and mortgage on their joint property to the bank to secure the loan to Shriner of $3,000, which he paid Green, and about $1,000 of the partnership funds of the

produce business. This debt has been paid down to about $2,000 out of the business. But the mortgage was finally foreclosed. Payments have also been made to Green on the other notes.

Shriner, Holley, and Green testified to the fact that the sale was made to Shriner, and that Holley had no interest in the business except that of having signed the note and mortgage. Sometimes when not engaged at the depot, Holley would help in the store. He lived in the Shriner home, as we have said, and his desultory service in the store is not conclusive that he was a partner. He has never claimed any direct interest, and his name has never been held out by him or Shriner as a partner. There was a general rumor in the community that he was interested, and some thought as a silent partner; but such rumors are not sufficient to support a finding that he was a partner.

It is argued that his partnership interest was silent because the railroad company would not countenance it. On the other hand, the evidence is that such was probably the reason why he did not become a partner in fact.

The only evidence to discredit the positive testimony of Shriner and Holley that he was not a partner or joint owner was that of the circumstances we have related in substance. Holley never received anything out of the business, unless it be his board on some sort of arrangement at Shriner's not explained.

It is also pointed out that L. T. Rhodes sued Shriner and garnished the insurance companies alleging that he and Holley were partners doing business as C. E. Shriner, and owed him; and that Shriner's answer to the cross-bill admitted those facts. But it appears that the claim accrued in the produce business of which Holley was a partner. At the same time in answering the original bill, he and Holley allege that the latter had no interest in the mercantile business. There is some evidence that the produce business was in the name of Shriner and Holley (page 208), and that the mercantile business was solely in the name of C. E. Shriner, although Rhodes sued on his produce account as though that business was conducted also in the name of C. E. Shriner.

Those circumstances are not sufficient to overcome the direct evidence which is without conflict that Holley had no finan-

cial interest in the mercantile business except as he permitted assets jointly owned by him and Shriner to be used in buying it, thereby to that extent lending his credit. We think the trial court was correct in holding that the conditions of the policy were not broken on account of the status of ownership of the business.

We have considered the other assignments of error, but the foregoing seem to be the points mostly relied on. We are not satisfied that there was reversible error.

Affirmed.

ANDERSON, C. J., and GARDNER and BOULDIN, JJ., concur.