21 So.2d 791

**AMERICAN LIFE INS. CO. v. ANDERSON.**

8 Div. 302.

Supreme Court of Alabama.

March 8, 1945.

Rehearing Denied April 26, 1945.

Hugh A. Locke, of Birmingham, Claud D. Scruggs, of Guntersville, and Wade H. Morton, of Birmingham, for appellant.

Thos. E. Orr, of Albertville, and Hill, Hill, Whiting & Rives, of Montgomery, for appellee.

**THOMAS, Justice.**

The submission was on the motion to strike the bill of exceptions or the transcript of evidence in lieu thereof and to strike various parts thereof.

The motions were supported by two affidavits attached to and made a part of the motions. The grounds, among others, were that the "bill of exceptions or transcript of evidence were not made up in accordance with the General Acts of 1943, p. 423;" Code 1940, Cumulative Pocket Edition, Tit. 7, § 827(1); and not made in accordance with Rule 48 of the Supreme Court, adopted June 28, 1944, Code 1940, Tit. 7 Appendix, 245 Ala. XXI, and XXII.

Salient facts touching the motion are that the verdict and judgment for appellee are of date of April 14, 1944, and on the 13th day of May thereafter, the appellant American Life Insurance Co., a corporation, filed in the office of the clerk of said court a motion for a new trial. The clerk certified the absence of the trial judge on that day. This likewise was shown by the certificate of the trial judge. He also certified that the motion was presented to him for hearing and determination on May 26, 1944, and set for hearing on June 12th, 1944. The further orders of the trial judge for continuance were respectively made within the time of the hearings, of date June 30th, and July 17th, 1944. On the latter date the motion was overruled by the said judge and appellant (defendant) excepted.

We take judicial knowledge of the location of the several county seats in Alabama, the confines of the several judicial circuits, the offices of the clerks of said courts, the number of circuit judges therein, and their official residence. The circuit judges and their residences are of record in the office of the Secretary of State and set out in the Alabama Reports. Touching the Ninth Judicial Circuit, in which this trial was had, see 245 Ala. VII. This is a matter of the history of our state. Time will be counted from the date of the judgment on the motion, since there was no discontinuance in the case at bar. Code 1940, Tit. 13, § 119; Montgomery Production Credit Ass'n v. M. Hohenberg & Co., 31 Ala.App. 117, 12 So.2d 865, no certiorari to this court.

This is an action in two counts on an insurance policy, which is not copied into the record, but which the reporter certified as Exhibit 1, with application for policy. The reporter certified further that the exhibits could not be "reproduced and copied on the typewriter." Photostatic copies of the application for the policy are not copied in the record as a part of the exhibited policy, the reporter certifying that he could not reproduce and copy same as a part of the record. So of the provision for double indemnity insurance on which the second count is rested.

Under the present statute the court reporter is required to "promptly transcribe the evidence, including objections, oral motions and rulings of the court, certify to it and file it with the clerk. He shall also identify and copy all exhibits offered in evidence in the order in which offered. * * * If any exhibits be offered in evidence which the court reporter cannot copy, he shall at the appropriate place describe and identify them and certify that they cannot be copied, and such exhibits shall be forwarded to the appellate court and be considered along with the record." General Acts 1943, p. 423, Code 1940, Tit. 7, § 827(1); Supreme Court Rule 48, adopted June 28, 1944. 245 Ala. XXI.

It is insisted by movant that the certificate of the court reporter that the foregoing transcript "contains a true and correct copy of the oral proceedings had and done in this cause to the best of my stenographic and reportorial skill and ability," does not comply with the statute, and does not show that the transcript "contains all the evidence." The record shows the

transcript of evidence of the trial was certified by the official court reporter of that circuit, and was filed with the clerk of the court on the 18th day of July, 1944. The court reporter, no doubt, did not make other certificate for the reason that he had omitted to copy all exhibits offered in evidence, for the reason stated by him in the record on notice and exhibited when offered in evidence. Gen.Acts 1943, p. 423, § 1; Code 1940, Tit. 7, § 827 (1). For example, the insurance policy, applications therefor, and the provisions for double indemnity are recited as Exhibit N–1.

It is insisted by appellant that the record affirmatively shows the required transcript of the evidence was filed with the clerk of the court within the time and in the manner provided by Code 1940, Tit. 7, § 827(1) et seq., and Supreme Court Rule 48. That the attorneys of record were notified of the filing of said transcript within the time and in the manner provided by statute and the rule of this court.

The record further shows that neither party filed with the clerk objections to the certified transcript within ten days from the date of its filing with the clerk or, as for that, at any subsequent date. It is not necessary to refer to the early history of the statute under consideration. It will be noted that on rehearing in Spurlock v. J. T. Knight & Son, Inc., Ala.. 18 So.2d 685, 688,[1] the court observed: "Upon consideration of the case of Algernon Blair et al. v. Brownie Burnell Greene, Adm'x. Ala. 18 So.2d 688,[2] the majority of the Court concluded that a transcript of the evidence duly certified by the court reporter required no approval of the trial judge in the absence of any question as to its correctness, as provided in the concluding clause of Section 1 of the act here involved. Rehearing was consequently granted, the judgment of affirmance set aside, and the cause restored to the docket for consideration upon the merits. The instant case is controlled by the decision in the Blair case, and upon that authority a like order is entered in this cause."

On the same day in Blair et al. v. Greene, Ala., 18 So.2d 688, 690,[2] the court held that acts abolishing bills of exceptions and substituting reporter's transcripts of evidence required the trial judge's approval of the certified transcript only when the correctness of the transcript of evidence was questioned, or a succinct statement of evidence prepared in case of the reporter's death, or inability, for some other reason, to transcribe the evidence. Mr. Chief Justice Gardner for the court said:

"Looking, therefore, at the act from its four corners, and considering its history, we are persuaded that it was the legislative intent to make the certified transcript of the evidence, when unquestioned, the record for consideration of the Court on appeal; and that the approval of the trial judge was not necessary in such event. His approval is necessary only when the correctness of the transcribed evidence is brought into question, or when a succinct statement of the evidence is presented in the contingency provided for in Section 3.

"Section 4, therefore, is to be construed as fixing the time within which the matters shall be done, and to provide for the approval of the trial judge in the event of a contest as to the correctness of the transcribed evidence or the succinct statement in the contingency provided for in Section 3. Such construction harmonizes all the provisions of the act, and we are persuaded carries out the legislative intent.

"We are further persuaded that a 'transcript of the evidence,' as used in this act, means a copy thereof. Such is the commonly understood meaning of the word 'transcript.' * * *"

This court takes judicial knowledge of the fact that immediately following the decisions in the above cases, Rule 48 of the Supreme Court was promulgated, giving what was understood to be the law full force and effect. Salient portions of said Rule 48 are:

"Upon filing the certified transcript with the clerk, the reporter shall also certify that he has notified both parties or their attorney of record that he has done so.

"Within ten days thereafter either party may file with the clerk objections to the certified transcript, with his certificate that he has notified the opposing party or attorney of record that the same will be called to the attention of the trial judge at a specified time and place. The hearing of objections and the ruling of the judge thereon shall all be concluded within a period of ninety days from the date of trial or the date of the ruling on motion for new trial." Code 1940, Tit. 7 Appendix, 245 Ala. XXI.

---

[1] Ante, p. 33.      [2] Ante, p. 28.

Counsel for appellant observe that the concluding paragraph of the said rule is as follows: "The certified transcript, though filed after the ninety-day period herein referred to but within the time for taking an appeal, will nevertheless be considered by the Court if no objection thereto is presented upon the submission of the cause; and it may be so considered in the discretion of the Court, even though the point as to the delay be presented on appeal, unless counsel objecting thereto shall point out, with supporting affidavit, material omissions or defects in such certified transcript which should and would have been the subject of contest before the trial judge; in which latter event the certified transcript is not to be considered." 245 Ala. XXII.

The questions for decision are, did the reporter comply with the law as to the instant transcript of evidence; and when no objection to the certified transcript was filed in the lower court and no proceedings had before the trial judge as to approval of the transcript of evidence or rulings on objections thereto by the trial court, may such objections be presented and decided in this court?

The reporter of decisions will set out in the statement of facts the salient provisions of objections and motions to strike the bill of exceptions or the transcript of evidence in lieu thereof by appellee filed in the cause in the Supreme Court on February 3, 1945. The substance of the two affidavits attached to the motion by one counsel and by the clerk of the Circuit Court of Marshall County will also be set out. As to this counsel for appellant insist that no objection to the certified transcript of evidence was filed with the clerk of the circuit court, and under the provisions of Rule 48 of the Supreme Court, there was no occasion for the trial judge to approve the transcript of evidence, or to rule upon objections thereto. The record shows that no such objection was made. Appellee further insists that the transcript of evidence being unquestioned before the circuit judge, as provided by the law, upon being presented to this court, it becomes the record for consideration on this appeal. That is to say, the procedure here by way of motion is unauthorized by the statute and decisions and Rule 48 of the Supreme Court.

There is a decision by Mr. Justice Foster, Home Insurance Company v. Shriner (Aetna Ins. Co. v. Shriner), 235 Ala. 165, 177 So. 890, 114 A.L.R. 574, where a question arose as to whether a note of testimony in an equity case should or should not be included in a transcript. The note of testimony was not included in the transcript, and the appellant contended that there was such a note, and that it should have been in the transcript. This court declined to pass upon that question, taking the view that it was not our province to determine what was properly a part of a record in a trial court, but that it belonged exclusively to that court. We, therefore, made an order directing that the question be determined by the trial court, if the appellant wished to have the question passed upon in this court. Nothing was mentioned in the opinion of the court on that subject, but our records disclose such an order.

Thereupon a proceeding was had in the trial court on motion of appellant to have a note of testimony made a part of that record. That proceeding resulted in a denial of the complainant's motion, and an appeal was taken to this court, which is reported in Home Ins. Co. v. Shriner, 235 Ala. 65, 177 So. 897, in which we reviewed the ruling of the trial judge on that motion, since his judgment was a final judgment, and we reversed, rendering a judgment that he did not give due consideration to certain principles of law, and that on the facts presented, the note of testimony was properly a part of the record. And when the appeal was considered, we treated the record as containing a note of testimony.

In Clark v. Henderson, 244 Ala. 237, 12 So.2d 743, the bill of exceptions was stricken on motion made when the bill of exceptions was, in fact, filed after the time provided by law, and the like rule obtains as to changing the same after such undue filing.

The question before us is one of striking certain pages or parts from the report of the proceedings by the reporter, properly certified, and after notice was duly given, for the alleged reason that said pages were inserted without consent of the parties after the reporter made his initial report and gave notice to counsel. The final certificate of the clerk to the record, on which submission was had and motion made upon submission, was:

"Certificate of Record.

"State of Alabama ⎫
"Marshall County ⎬ Circuit Court.

"I, J. B. Hawk, Clerk of the Circuit Court of Marshall County, Alabama, in and for said County, hereby certify that the foregoing pages numbered from 1 to 378 inclusive contain a full, true and complete transcript of the record and proceedings in the cause of: J. William Anderson—vs—American Life Insurance Company, of Alabama, a Corporation, as the same appears and remains of record and on file in this office.

"Witness my hand and seal of this court this the 26th day of January, 1945.

"(signed) J. B. Hawk
"J. B. Hawk, Clerk of Circuit Court,
"Marshall County, Alabama."

The above certificate was made within the time of taking the appeal and more than six months after the certificates of the official court reporter.

■■ We may add the further observation that the last paragraph of Rule 48 has nothing to do with the correction of the record. If the record is not correct when filed, it must be corrected as provided in the previous paragraphs of said rule. The last paragraph merely provides that though the stenographic report is not filed in time, but is filed within the time of taking an appeal, this court may, in its discretion, no objections being made thereto, consider the record as filed. If objections are made by appellee, with supporting affidavits pointing out wherein the record is not correct, and such objection is sustained, the court will exercise its discretion against the appellant, and refuse to consider the record. 245 Ala. p. XXII.

■ It is the province of the trial court, duly invoked, to determine under the statutes, Rule 48, and our decisions, what should be incorporated in the record on appeal, subject to review on final determination, as from any other final judgment.

■ Supreme Court Rules 24 and 25 are not invoked in this case. Code 1940, Tit. 7 Appendix, p. 1013. Rule 27, touching matters omitted from the transcript, under the former statutes and decisions, is not in conflict with Rule 48, recently interpreted and applied by this court. Code 1940, Tit. 7 Appendix, p. 1015.

■ For illustration, does an inspection of Exhibit I ("Application for Insurance" with "Provisions for Double Indemnity for Accidental Death"; and "Policy of Insurance of date of March 14, 1940," with "Double Indemnity Rider Attached. Dated Back Saving Age"), show that the same could have been copied into the original transcript by the reporter on the typewriter? Is such Exhibit I saved by the certificate of the court reporter taking the testimony that he could not reproduce the same and that they could "not be copied on the typewriter"? These documents are the basis of the lawsuit on which the judgment appealed from is rested. It is not necessary to comment on the "Schedule of Exhibits" from One—"Insurance Policy Sued On"; Number Three "Note" (on which the insurance was obtained); and many others, including pictures of the car and the defendant's · clothing, which may fall within the rule that obtains, as these exhibits were introduced on the trial and do not touch the interpolated matter In compliance with the Act of July 12, 1943, as amended by Rule 48, supra, the court reporter is not required to make photostatic copies of exhibits, nor undertake to copy them unless it can be done on a typewriter or printed. See Rule 26, Supreme Court. If no objection is made, as provided in Rule 48, supra, because an exhibit is not copied by the court reporter, or if the trial judge holds on objection that the reporter cannot copy the exhibit, it will be considered by this court, if properly certified, and sent to this court, subject to review as provided in said rule.

■ The affidavit of the clerk of the court and of one counsel for appellee places beyond controversy the true status of the alleged record as the transcript of evidence entered and placed before us. The appellant, recognizing that it could not properly insist that pages 35–1 to 35–41, inclusive, were filed within the time, or constituted any part of the record, expressly waived assignment of error one and assignment of error two. These are assignments of error going to the overruling of defendant's motion to quash service, and to the refusal of the affirmative charge on defendant's plea in abatement, to which matters pages 35–1 to 35–41 of the record relate.

The appellee's motion to strike and argument on file in this court is to the effect that:

"When the appellant has caused the record to be materially altered on more than

one occasion, it should not simply decline to profit by such alterations, but that its action has in legal effect invalidated the entire record, and that the certified transcript of the evidence should be stricken.

"It is respectfully submitted that upon any one or more of these several grounds (of the motion), the Court should sustain the appellee's objections and motions to strike the certified transcript of the evidence."

We are not in accord with the insistence of the motion to strike the whole transcript of evidence on which the verdict and judgment of the court rested. The matter incorporated in the record by the clerk of the court, after the court reporter's certificate and notice, is not considered, or necessary for consideration, in a judgment here on the main question presented by this appeal. The appellant does not insist upon assignments of error on the motion to quash the service or on refusal of the affirmative charge.

The motion is overruled, insofar as it relates to striking the entire record; but the motion is granted, as to the transcript of the testimony relating to defendant's plea in abatement, because it appears on its face that it was filed January 4th, 1945, and without authority of law.

All the Justices concur as to the ruling on the motion, except GARDNER, C. J., not sitting.

## On the Merits.

Applications for like amounts of insurance on the lives of appellee Anderson and his wife were dated February 28, 1940. Their medical examinations followed on March 4th, and the policies of insurance, with applications made a part thereof, were dated March 14th. The insured Lois H. Anderson died April 26, 1940, from wounds inflicted on April 24th, the result of an alleged automobile wreck.

A consideration of the evidence convinces us that prior to taking out the insurance, the appellee was going with a woman other than his wife. The insured Lois H. Anderson informed friends that she was pregnant, and had begun to make preparations for her confinement. Aside from taking out the foregoing policies on the respective lives of husband and wife, payable to each other, appellee procured a burial insurance policy and a vault policy on himself, his wife and a crippled child. After the wife's death, appellee procured burial policies on his other two children.

On the morning of April 24th, one month and twenty days subsequent to the issuance of the policies of life insurance, appellee took his wife in his car to Gadsden, to investigate what she was to receive from the estate of her uncle. Late in the afternoon, appellee and wife left Gadsden to return to their home on Brindley Mountain. In Gadsden the wife bought some dresses. Appellee purchased some fuses for the lighting system of his car that had theretofore given him trouble. Appellee stated that upon leaving Gadsden, they stopped at convenient places and bought some fruit for the children and some tomato plants. The husband and wife were alone in the car, and as they proceeded homeward, at about 8:30 P. M., they were stopped near Guntersville by the state highway patrolmen. These state officials checked the lights on appellee's car, found them to be working properly, inspected his driver's license, and permitted them to proceed on their way. There were no houses along this wooded section of Brindley Mountain road, except one in the valley, or at the foot of the mountain. The description of the accident is given by Anderson as follows:

"Q. When you started up the mountain you say you were going about forty or fifty. Did you hold that speed until you got to the place? A. Approximately, and this side where I went off there was a gully in the road where the road sunk down—a fill there and this road was sinking down and as I went over this my lights flickered out and in a minute or two came back on and in another minute or two they went off and I put my brakes on and the next thing I knew I was going off the fill.

"Q. When you came to a stop where were you? A. Under the mountain, this fill.

"Q. Down on the side of the mountain? A. Yes. * * *.

"Q. What was the condition of the ground along there from the point where you went off to the tree where you stopped? A. Large rocks, bushes and briars.

"Q. What part of the car struck the tree and how did it stop? A. The front part of the car.

"Q. Was the tree to the right of the center or left? A. A little to the left of the center of the car.

"Q. When you hit the tree, what did you do then? Were you normal then? A. I were knocked out for a little bit. I don't know how long. When I came to myself I tried to get out and opened the door on my side. The ground was low and the car was up and I could not reach the ground with my feet.

"Q. The ground broke away fast on that side? A. Yes. My feet would not touch the ground so I got ahold of the door and got my feet out and on the ground and straightened up myself and started around the front and there were bushes and briars and I could not get around the rear on the right and opened the door to get hold of my wife.

"Q. What condition was she in? A. Just laying over against the front of the car.

"Q. You got hold of her? A. Yes.

"Q. What did you do? A. Pulled her out of the car.

"Q. Was she conscious? A. I could not say.

"Q. What did you do for her? A. I asked her if she was hurt and she said she did not think so and rubbed her hand over my face and felt some blood and said, 'Willie, you are hurt.' I said, 'I don't think so.' About that time she began vomiting and I had to sit her down. She could not stand up. I rested a minute and picked her up and sat her in the front seat of the car. I told her I would have to have some help. She said, 'Well.' I crawled out from there and got up to the top of the mountain to get help."

Appellee stated he went for help to a man's residence, gave the alarm and requested an ambulance to take his wife to the hospital. Appellee claimed that at this point things seemed to temporarily go blank with him. The testimony tended to show that he was slightly bruised, his pants torn and leg scraped. He tried to drink water and could not and a witness said he acted at the time like a drunk or crazy man, but no one smelled whiskey on his breath; and that he begged for help for his wife. The evidence further shows that Anderson was taken to the hospital at Guntersville, where he was treated for slight bruises, a cut on the head, and bruise on his leg where his pants were torn. Meanwhile an ambulance had taken his wife to the hospital at Arab, where she died a day or so later. The testimony further tended to show that when Anderson was treated for his slight injuries, he returned to the scene of the accident, inquired of the people there the extent of his wife's injuries, and then hastened to the hospital where she was, and there remained until she died.

When Mrs. Anderson was taken to the hospital, she was bleeding from the head, mouth and ears, and there was an injury to the side of her head and to the front. There were bruises on her hand and arms, no broken bones, except the point indicated on her head. The skull exhibited sustains the serious nature and designations of the place of her injury. There was a difference of opinion among the witnesses, except the experts, as to whether she could or did speak at the hospital. The testimony of the medical experts was to the effect that her skull was crushed just back of the temple, at a point slightly above the ear, and the ear was not injured. The skull bone immediately in the rear of the ear was crushed, and brain tissues were oozing out therefrom. The skull exhibited shows two bruises well separated on the front thereof, which did not break the bone. The experts were of opinion that after such injury, she could not have made a conscious statement, or perceived her husband's face, or made comment upon it, as the husband stated she did.

Adverting to the track of the car over the bluff to its resting place, the testimony and exhibits show that the left side of the front was jammed into a tree in a briar patch, affecting the opening of the car door, as appellee testified. The car track from the bluff turned directly to the right, going down the bluff, and did not roll over before striking the tree or sapling about 100 feet from the highway. There was no obstruction in the way to break the windshield.

Appellee, as a witness, admitted having a blackjack in his possession in the car when he and his wife were coming up the mountain; stated it was in the glove pocket of the panel of the car; that he did not take it out; did not know who removed it from the car after the accident; and had not seen it since. However, after the death of his wife, appellee inquired of a witness, who had inspected the car after the accident, whether or not he had seen his

blackjack or his pistol when at the scene of the accident.

Witness Verna Patten testified that about a week before the accident she was with Anderson and Rhinehart in Alabama City in front of the picture show, and was asked: "If either one of them said in your presence, or in the presence of each other, that if their plans went through they were going to buy the picture show and spend about a thousand dollars on it and give you a job as ticket taker? And over the objection of appellee's attorney, to which exception was reserved, the witness answered that they said they would do such, "If everything worked out all right."

A deputy sheriff at the time of the trial and a state highway patrolman at the time the accident occurred, and Gornam, a highway patrolman, examined the car after the wreck at about two o'clock A. M., including the lights and testified "the headlights worked," that the windshield was broken from the outside, and observed blood as they inspected the car on the floor, seat and running board, as shown by the pictures in evidence. The pictures were taken by one of the state department. The witness further testified that the blood was washed off the morning afterwards when they inspected the car. These were the same patrolmen who had inspected the lights of Anderson's car at 8:30 P. M., as he proceeded on his way up Brindley Mountain, and they testified the car lights were shining at that time before the accident. On cross-examination the witness said:

"Q. What light was it after you went there did you check to see if it was working? A. Head lights and tail lights would both burn and also the dome light would burn.

"Q. Was anybody there with you when you checked those lights? A. Mr. Gornam there.

"Q. You notice that windshield over there and a part of that glass is now out. Was that out when you saw it down the mountain? A. It was not.

"Q. Was not? At that time? A. No.

"Q. I will ask you to look at that picture here and ask you if that is a true picture of that car and of that windshield when you saw it after the accident? A. It is. * * *."

After reaching the hospital at Arab, appellee stated to one witness that he did not remember going down the bluff in the car, and said it "seemed like it throwed" him out "somewhere." He stated as a witness that he went over the bluff and to the tree as indicated in the picture, and stated the cause of his accident and injury, as hereinbefore set out.

Dr. Martin, who was present at the autopsy, testified that based on the location and nature of the fracture on Mrs. Anderson's head, the fracture was not the result of a blow such as striking the inside of a car in a collision; that such fracture was produced by a blow from a blackjack; that the windshield of the car was shattered as if struck by some object. There was other testimony that the break in the windshield was produced by a blow from the outside. The windshield is before the court and demonstrates that the shattering of the windshield was from force applied from the outside, being slightly bent toward the inside of the car, and all the uneven shatters or sharp edges of the glass point to such result—that the break was from force applied from without, and not from a collision with the tree. The marks of breakage in the glass on the outside are smooth and even, while those on the inside are rough, not even, pointing to the inside. We are convinced from the whole evidence that the breakage of the windshield was not the result of an accidental force in the contact of the car with the sapling, but the result of a force applied thereto from without before or after the car was removed from the bluff.

The post mortem examination of Mrs. Anderson's body by Doctors Nixon and Jones of the Department of Toxicology discloses a laceration of the skull about 1½ inches above the right eye; that the eye and bridge of the nose on the right side were blood shot and showed swelling; that the right hand was swollen and bloodshot just below the knuckles; that there was no broken bone in the hand; that the balance of the body showed no bruises, except just over the left hip, which was large and bloodshot; that a laceration appeared immediately above and behind the ear. That when the scalp was removed from the skull, it was found that the temporal bone had a multiple fracture; that part of the bone was loose and imbedded in the brain tissue back of and above the ear; that the fracture of the skull above and behind the right ear was lengthwise, and injured the mastoid bone, while the ear on that side was not injured.

It was shown that the car was a two-door sedan. There was blood in the bottom of the car in the front of the right side of the front seat, and it ran out on to the running board and along the running board to the back fender where it dropped off to the ground. One witness testified that when he next saw the car after its removal from the scene of the accident, he noticed the blood had been washed off from the running board; that "the car was bloody in the foot board on the right running board the night of the accident and the following Monday, it was not bloody." That he checked the lights of the car around eight o'clock of the night of the injury, and the car lights were working. That when he went down to the car after it had gone down the mountain, the lights were working. That he turned them on and they burned.

Mr. Mashburn, the State Highway Patrolman, testified that he examined the scene after the accident. The car rested against a tree or sapling and the marks from the highway to such point were at a 45 degree angle from the road to the bluff where the car went over, and that it ran about 98 feet into the sapling. He testified that most of the blood was "on the floor board of the front seat and spots on the back seat and on the extreme back was other spots of blood." That blood extended "the entire length of the right running board"; that when he saw the car at the scene of the accident on the back right fender of the running board some blood "dripped there"; that he found in the back seat of the car a blanket folded up with clotted blood on it and there were splotches of blood on the back part of the front seat and between the seats near the floor where Mrs. Anderson sat.

The witness Tidmore testified there was blood on the windshield and "puddled" in the car under the seat and "come out and ran off the running board back next to the back fender, a stream as big as my finger." The testimony further showed that the front end of the car was jammed into a tree and briars when Mrs. Anderson's body was found therein. The car was standing on its wheels and the back end was straight up the cliff towards the road; and, as counsel for appellant aptly observes, "blood does not run upstream."

The witness Brandon testified that Mashburn said at first if Anderson would give up the policy, the prosecution would be dropped.

The testimony shows Mrs. Anderson was about four months pregnant when she was examined for the insurance, though she made a negative answer to such question. Doctors Jones and Nixon testified the fetus introduced in evidence was $4\frac{1}{2}$ to 5 months old. Dr. Crawford testified when Mrs. Anderson was brought to the hospital, his examination showed she was $3\frac{1}{2}$ to 4 months pregnant. Other testimony showed that pregnancy produces the danger of death by childbirth at a ratio of 28 to 1,000; and the physician for defendant company testified he required further examination if a woman stated in her application for insurance she was pregnant, and if the company accepted her after further examination, a pregnant woman was charged an additional rate of $5 per thousand for the first year's premium on the policy. The expert testified that childbirth endangered the life of a woman, and among physicians is rated as a major surgical operation, insofar as danger is concerned.

The vice president of the company testified he passed on the instant application for insurance, and if Mrs. Anderson had answered she was pregnant in her application, he would not have approved it for a standard rate, but would have required an additional examination; and thereafter, if the policy had been issued, the company would have required an additional premium of $5 per thousand for the first year.

It is further to be noted, in connection with the application for insurance, that the fetus exhibited to this court was said by experts to have been well advanced, from four to five months in growth, which is indicated by its appearance of simple growth of hair, finger and toe nails, and the sex organ, showing it was a boy. This court has recently distinguished between expressions of opinions by experts, and testimony of an expert, as to the existence or nonexistence of a fact, proved solely by scientific processes, methods of determination or knowledge. Pollard v. Treadwell, 234 Ala. 615, 176 So. 452; New York Life Ins. Co. v. Zivitz, 243 Ala. 379, 10 So.2d 276, 143 A.L.R. 321; Provident Life & Acc. Ins. Co. v. Downey, 242 Ala. 482, 7 So.2d 17; Grabove v. Mutual Ben. Health & Accident Ass'n, 241 Ala. 88, 1 So.2d 297.

Our cases are in accord on a jury question presented under the statute. Code 1940, Tit. 28, § 6. It is sufficient if the

602

"misrepresentations are false and relate to matters which increase .the risk of loss." Vredenburgh v. Liberty Nat. Life Ins. Co., Ala., 20 So.2d 207, 213;[1] Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755; National Life & Accident Ins. Co. v. Collins, 244 Ala. 182, 12 So.2d 353.

We have stated the tendencies of evidence touching the agency materially contributing to the homicide. It is well established that a beneficiary in a life insurance policy, who murders or feloniously causes the death of an insured, forfeits all rights which he may have in or under the policy. This rule, based upon sound public policy, and the principle that one should not be allowed to benefit from his own wrong, was announced by the Supreme Court of the United States in New York Mutual Life Ins. Co. v. Armstrong, 117 U.S. 591, 6 S.Ct. 877, 29 L.Ed. 997. The general authorities are collected in 29 Am.Juris. 979, § 1310; Johnston v. Metropolitan Life Ins. Co., 85 W.Va. 70, 100 S.E. 865, 7 A.L.R. 823; Spicer v. State, 198 Ala. 13, 73 So. 396; Sovereign Camp, W. O. W. v. Gunn, 227 Ala. 400, 150 So. 491; Protective Life Ins. Co. v. Linson, 245 Ala. 493, 17 So.2d 761.

A study of the evidence discloses many unexplained incriminating circumstances. To illustrate, appellee wrote the general agent of the instant insurance company that he was ready to take out the insurance he had previously discussed with him, but the evidence shows, he had just previously surrendered a $5,000 insurance policy in the Mutual Life. He had only $200 to pay on the premium of about $450, but the evidence shows, he had just previously indicated his intention to purchase a picture show ,business, improve the same at large expenditure, and make the party to whom such representations were made the ticket seller. And, while in Gadsden on the day of the alleged accident, appellee had been prospecting for a new car.

There are contradictions or unexplained facts in Anderson's testimony, among them being the testimony as to whether or not he could have opened the door on the lefthand side of the car; where he got the flash light he had in hand when he went for help; his inquiries of who got his pistol out of the car; why he had a blackjack in his car and when and why it was taken therefrom; how his wife's hat (which she wore to Gadsden) was placed and found by an impartial witness unsoiled or unbroken between the steering wheel and base of the windshield of the car; and when and why his little child's used toy or bicycle wheel was placed in the car.

We have indicated, the evidence shows there was blood on the front and back of the seat of the car in which his wife was riding, and on the seat where the driver sat. Defendant's pants, exhibited before this court, have a slight discoloration at about the location of the blood on the left side of the front seat of the car, and the fact of the location of .blood is likewise shown by the picture in evidence to be on the seat of the car where the driver sat. If the assured was killed while in a sitting position and before they approached the point where the car went off the road, such blood stains are understood. If her injury was caused by the impact of the car with the small tree after the car left the road, as shown by the picture in evidence, the foregoing facts are not readily explainable.

There is further testimony that immediately after the funeral and burial of his wife, appellee went to the woman's (in question) house, and remained there for some time. Such fact is attested by two witnesses who are not shown to be interested.

The witness Tidmore, who testified for the defendant, stated that upon hearing of the accident he and the witness Brandon went immediately to the scene thereof, and stated the conditions obtaining when they saw the car. The witness observed that the windshield appeared to have been "broken from the outside of the car." That there was blood on the windshield and a puddle of blood in the car on the floor board; that the blood was on Mrs. Anderson's side under the seat, "and came out and ran off the running board against the fender of the car." That the blood ran out of the car "where the door closed," and ran on down the running board and ran off back next to the back fender; that Anderson talked to him about the tragedy and said, "I was hurt pretty bad in the knee or hip somewhere." The witness was asked if Anderson said anything to him with reference to testifying in the case and replied: "The only thing he ever said to me was asking me to stick to him." This conversation occurred the next day after Mrs. Anderson was buried. The witness further testified that Anderson had a pistol "at that

[1] Ante, p. 251.

time," and called me into the room, had a string of ladies' purses on his arm and asked me to identify the one that I saw the night of the wreck, and the witness told him he "did not see one that night;" and Anderson then said he wanted to know who got the gun and asked me if I saw the gun and I told him I didn't and I asked him, "Where is the gun?" Anderson opened the tray of the trunk, showed me his gun and said: "Somebody got my gun out of the car that night." Witness was then asked, "When he opened that tray and you saw his gun what did he do?" and answered, "He picked it up and I was standing in front of him, and he held it like that (pointing in the direction of witness) and says, "Tidmore, you had better stick to me,' with the gun in his hand." Subsequent to that conversation, the witness further testified, "He accused me of talking a little too much and met me between his house and the line of his place above the Chasteen place, he was in something like fifty feet of the road there and I was walking the road and he hollered at me and come on up whittling with a knife and says, 'Tidmore, we have always been friends and I am going to ask you one more time to stick to me,' and kept whittling. Q. Did you make any remarks? A. I says, 'I wear a #9 shoe and cover all the ground I stand on, and I have not said anything I am going to take back,' and walked off."

In connection with the above detailed evidence, it should be observed that, in a civilized country, the rule of obstructing justice obtains. Code 1923, § 3472, Code 1940, Tit. 14, § 79. "Evidence that a party attempted to prevent a fair trial, as by the suppression or fabrication of evidence, is admissible to show that he is conscious of the weakness of his case." 31 C.J.S., Evidence, § 179, p. 880. The rule in this jurisdiction is best stated by Mr. Justice Bouldin in Drummond v. Drummond, 212 Ala. 242, 102 So. 112, 114, as follows: "Any effort by a party to intimidate a witness, to create bias or prejudice in his mind against the other side, or to suppress testimony, may be used as evidence against such party. The inquiry is not its effect on the witness and his testimony, but its probative force against the party resorting to such means to effect his ends. Such facts clearly shown often work the undoing of the party guilty of such practice. It indicates, not a seeking after justice, but an effort to poison the stream of justice.

The reaction is a poison to the cause of him who seeks to use it. * * *"

An inspection of Mrs. Anderson's skull, together with the explanation of experts as to the injury being caused by the infliction of a blow, rather than by a collision; and the fact that the ear was uninjured immediately adjacent to the broken skull and bone, point inescapably to the conclusion that the injury causing insured's death was intentional, rather than the result of the alleged accidental impact of the car with the small tree or sapling, picture of which is before the court as an exhibit.

Sam Weaver, a witness for the defendant, who went to the scene of the accident with Mr. Brandon and Al Tidmore the night it occurred, testified as follows:

"Did you talk to Willie Anderson that night? A. Yes, a little.

"Q. Where were you? A. In Arab.

"Q. What was said by Willie Anderson, or in that conversation? A. I asked him, 'I don't believe you went down in that car.' He said he didn't remember, 'seemed like it throwed him out somewhere.'

"Q. Did he say anything else? A. Said he didn't remember anything from the time the lights went out until he came to in the hospital when they were putting a patch over his eye. * * *."

To answer this phase of the evidence plaintiff introduced in evidence one of Anderson's handkerchiefs,) which the witness claimed to have picked up below the bluff sometime after the accident, and the evidence shows that it was similar to the one Anderson testified his wife had given him as a present. These handkerchiefs had been laundered and it is urged that the one picked up had blood on it. It is not clear from the evidence, however, whether the discoloration on the handkerchief was caused by blood or iron rust.

Many charges were requested, shedding light on the several phases of the case. The court did not err in giving such charges. They were in accord with the general charge of the court and the law that obtains. The many refused charges were either covered by given charges, invaded the province of the jury, or were misleading or erroneous. Refused charges numbered 38 and 39, if insisted upon, were properly refused, in taking from the jury the right to say, whether, under all the evidence, such false representation increased the risk of loss, or that the new trial

should have been granted thereon, to appellant's prejudice and injury. However, we do not find that appellant insisted upon assignments of error XXXX or XXXXI, covering the refusal of these charges, and when the part of the general charge of the court, to which exception was reserved by appellant is considered with the other instructions given by the court, there was no error.

When the whole record is considered, together with the many exhibits, we are of opinion that, "The preponderance of the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust." Cobb v. Malone & Collins, 92 Ala. 630, 9 So. 738, 740; Bell v. Nichols, 245 Ala. 274, 275, 16 So.2d 799. The motion for a new trial should have been granted on this ground.

It results from the foregoing that the motion is overruled, insofar as it relates to striking the entire record; but the motion is granted, as to the transcript of testimony relating to defendant's plea in abatement, because it appears on its face that it was filed January 4, 1945, and without authority of law.

All the Justices concur as to the ruling on the motion to strike the record, except GARDNER, C. J., not sitting.

The judgment of the circuit court is reversed, and the cause remanded.

Reversed and remanded.

FOSTER, STAKELY, and SIMPSON, JJ., concur.

GARDNER, C. J., not sitting.