**GRAYSON–CARROLL–WYTHE MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant.**

Civ. A. No. 82–0235–A.

United States District Court, W.D. Virginia, Abingdon Division.

March 6, 1984.

W.H. Jolly, James T. Ward, Galax, Va., for plaintiff.

William M. Moffet, Abingdon, Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

This case is before the court on the cross motions for summary judgment filed by the plaintiff and the defendant, pursuant to Rule 56 of the Federal Rules of Civil Procedure. The plaintiff, Grayson-Carroll-Wythe Mutual Insurance Company (hereinafter, Grayson), originally filed its suit in the Circuit Court of Grayson County. The plaintiff claims that as a result of the total destruction of the insureds' property by fire, it has paid the insureds a total sum of ONE HUNDRED THOUSAND TWO HUNDRED THIRTEEN DOLLARS AND SEVENTY–EIGHT CENTS ($100,213.78) and that since the insureds' property was covered by policies of both the plaintiff and the defendant, the defendant now owes its pro rata share of this sum according to the terms of the contractual agreement between the insureds and the defendant.

The defendant, Allstate Insurance Company (hereinafter, Allstate), filed a Petition

for Removal, pursuant to Title 28 U.S.C. § 1446(a). The petition was based on the two requisites that the matter and amount in dispute of the civil action exceed the sum of $10,000, exclusive of costs and interests, and that the controversy be between citizens of different states. The plaintiff is a citizen of the Commonwealth of Virginia, and the defendant is an Illinois corporation with its principal place of business outside the Commonwealth of Virginia. Thus, the court has diversity jurisdiction over the present cause of action, pursuant to Title 28 U.S.C. § 1332(a), (c).

## I. FACTUAL SUMMARY

Rena D. and Larry E. Noel purchased a home in Grayson County, Virginia, in 1977. They obtained their insurance with Allstate through K. Sharon Haga, an insurance agent employed by Kyle and Williams Insurance Agency in Galax, Virginia. (Deposition at 4). The original policy had dwelling coverage limits of $45,000: It went into effect on November 18, 1977. (Deposition at 4, 5). The policy was renewed on November 18, 1978, on November 18, 1979, and on November 18, 1980. (Deposition at 35). By 1980, Allstate had increased the dwelling coverage limit to $60,000. (Deposition at 5; Exhibit D-8).

Before the premium-period renewal date of November 18, 1981, Allstate sent the Noels a premium notice in which a proposed increase on the dwelling coverage to $70,000 would become effective on November 18, 1981. (Deposition at 6-7, 131; Exhibit D-1). When the Noels did not respond to the premium notice, Allstate then sent them a notice of a Reminder of Payment Past Due. (Deposition at 8, 131; Exhibit D-2). The Noels did not respond to this notice. On December 7, 1981, Allstate mailed to the Noels a Notice of Cancellation for Non-Payment of Premium. (Deposition at 9, 131; Exhibit D-3). By means of the cancellation notice, Allstate informed the Noels, *inter alia*,[1] that the insurance afforded by their policy would stop at 12 noon on December 26, 1981. (Exhibit D-3; *see also:* Exhibits P-1, P-2, P-5, and P-7 in which December 26, 1981, was noted as the date on which the Allstate policy was to be terminated).

Because of some improvements to their home, the Noels desired to increase their coverage limits and to compare insurance rates. (Deposition at 6). On November 20, 1981, Joseph Liddle, Secretary-Treasurer of Grayson, visited the Noels' residence for appraisal purposes. At this time, he also learned of the existence of the Allstate policy with the Noels but not of its specific terms of termination. (Deposition at 89, 93). On November 23, 1981, the Grayson policy with dwelling coverage limits of $80,000 and with a three-year term went into effect: Shortly thereafter, the Noels paid their premium to Grayson. (Deposition at 10-11, 88, 90-91).

The Noels' residence was completely destroyed by fire during either the night of December 10 or the early morning hours of December 11, 1981. (Deposition at 14). The Noels were out-of-town at the time of the fire. (Deposition at 14). When they returned home on December 11, 1981, they notified Grayson around 10:00 a.m. of their loss. (Deposition at 16-17). They, however, did not notify Allstate of the loss. (Deposition at 17). Their lack of personal notice to Allstate was based on their lack of understanding the terms of termination given in Allstate's notice of cancellation. (Deposition at 31-32).

Allstate, nevertheless, became aware of the destruction of the Noels' residence on December 11, 1981. Having heard the radio report concerning the fire, Agent Sharon Haga on her own initiative called the Allstate Claim Service and reported the incident. (Deposition at 36; Exhibit P-4). Samuel L. Corso, a claims adjuster for All-

---

1. The notice of cancellation also stated that the Bank of Floyd, the first lien holder on the Noels' home, was sent this same notice. The Bank, however, never received the notice of cancellation sent to the insureds. (Deposition at 57; Exhibit D-6). On January 5, 1982, the Bank received from Allstate a mortgagee's notice of cancellation of the insured's policy which would become effective at 12 noon on January 15, 1982. (Exhibit P-1).

state, was assigned to handle the reported Noels' claim. (Deposition at 102). Mr. Corso verified the information by a telephone call to Agent Haga that same day. (Deposition at 103). Then, he opened the file on this matter and established loss reserves on the claim. (Deposition at 108; Exhibit P–2).

On or about December 14, 1981, Agent Haga ran into Mrs. Noel at a bank in Galax, Virginia. She advised that Mrs. Noel should contact Allstate and report the loss. (Deposition at 37). Mrs. Noel informed Agent Haga that they had not renewed their policy with Allstate and had obtained an insurance policy with Grayson. (Deposition at 20, 37). Although Mrs. Noel made no comment concerning the filing of a claim with Allstate, Agent Haga assumed no such claim would be made. (Deposition at 38).

That same day, Agent Haga returned to her office and called Mr. Corso to advise him of the contents of her conversation with Mrs. Noel. (Deposition at 38, 132). Mr. Corso, in turn, called Mr. Liddle of Grayson to verify the fact that the Noels had a policy with Grayson and to advise Grayson that Allstate's policy with the Noels had been cancelled. (Deposition at 94–95, 136). As a result of this conversation with Mr. Liddle, Mr. Corso on or about December 14, 1981, closed the Allstate's claim file on the Noels' matter and cancelled the reserves on this loss. (Deposition at 132–133, 139). Later, on December 22, 1981, Mr. Corso wrote in response to a dated 12–18–[81] Underwriting Action Request from the Regional Office of Allstate in Roanoke, Virginia: "Pls [Please] note loss occurred 12/11/81. —in'sd [insured] had taken out insurance w/[with] Grayson ... in Galax prior to loss. —At present no claim being made against policy by in'sd. [insured] and no volunteering of same." (Deposition at 119–120; Exhibit P–5).[2]

On December 11, 1981, Grayson hired Hayes H. Groves, a corporate officer of Southwest Virginia Investigation and Adjustment, Inc., to investigate, negotiate, and settle the Noels' claim. (Deposition at 58–60). That same day, he made an initial investigation at the scene of the Noels' destroyed home and talked with Blake Shores of the Grayson County Sheriff's Department. Mr. Shores informed Mr. Groves that because of the Noels' absence from their home, arson was suspected, that the Virginia State Fire Marshal's Office had been contacted, and that he was of the opinion that the Noels had insurance on their risk with Allstate. (Deposition at 61, 68). Neither Mr. Groves nor the other investigatory officials ever found any evidence of arson. (Deposition at 65, 66, 67).

Mr. Groves pursued the matter concerning the Noels' policy with Allstate by first calling Agent Haga on December 11, 1981: She informed him that Allstate had been advised of the Noels' matter. (Deposition at 69, 71). Then, on or about December 22, 1981, he discussed the matter with Bruce W. Thompson, Executive Vice President of the Bank of Floyd. (Deposition at 50). Mr. Groves confirmed his telephonic conference by writing Mr. Thompson on December 23, 1981: He stated, *inter alia,* that "we are of the understanding that the former contract [of the Noels] was with ... Allstate ..., and that contract of insurance may in fact overlap with the coverage extended by our principle [sic], ... Grayson...." (Deposition at 68; Exhibit D–5). On December 28, 1981, Mr. Thompson responded to Mr. Groves' letter by writing, *inter alia,* that the Bank had on file the Allstate's most recent payment notice to the Noels for the renewal period from November 18, 1981 to November 18, 1982, but the bank had not received a Cancellation Notice from Allstate for the Homeowners

**2.** On this Underwriting Action Request, an individual (with unidentifiable initials) from the Underwriting Department wrote on 1/4/82: "Pol[icy] term [or termination] 12/26/81 for non pay[ment]—Ins'd [Insured] has new policy w/ [with] another co[mpany]." (Deposition at 118–119; Exhibit P–5). *See also* Exhibit P–6 in which a 12/11/81 computer print-out concerning the Noels' policy with Allstate showed, *inter alia,* that by the terms "Notice Accepted A" the Noels' policy was still in force: Thus, Allstate confirmed coverage. (Deposition 120–123).

Policy. (Deposition at 54–55, 71; Exhibit D–6; *see also supra* note 1).

Upon the completion of his investigation, Mr. Groves recommended that negotiations be implemented with the Noels. On or about March 10, 1982, Mr. Groves reached a settlement with the Noels' attorney, Jerry Geisler, concerning their claims under the dwelling and the additional living expenses coverages of the policy. (Deposition at 74–75). On April 9, 1982, Mr. Groves wrote a letter to the Property Division of Allstate in Roanoke, Virginia, in which he stated, *inter alia,* that Grayson intended to file a claim against Allstate concerning the Noels' matter. (Deposition at 70, 72, 133; Exhibit D–7). On May 27, 1982, Mr. Groves reached a settlement of the Noels' claim under the personal property coverage of the policy. (Deposition at 76–77). On May 28, 1982, the Noels signed and tendered to Mr. Groves the Final Proof of Loss. (Deposition at 77; Exhibit D–4).

On June 15, 1982, James T. Ward, counsel for Grayson, wrote the Property Division of Allstate in Roanoke, Virginia: He reaffirmed Grayson's intent to file a claim against Allstate and enclosed copies of the Proof of Loss and Subrogation Agreement. (Deposition at 127, 134; Exhibit P–8). Allstate then forwarded Mr. Ward's letter to Mr. Corso. On June 25, 1982, Mr. Corso responded to Mr. Ward's letter, by writing, *inter alia,* that "on advice of legal counsel, I find that I must deny your client's subrogation claim. It is our opinion that Mr. Noel did not accept the renewal of Allstate's Policy and therefore no contract of insurance was in effect on December 11, 1981." Shortly after the receipt of Mr. Corso's letter, Grayson instituted this cause of action against Allstate.

## II. THE ISSUES

The issues[3] currently in dispute are: whether Allstate had an enforceable contract with the insureds on the date of the total destruction of their home by fire; whether Grayson had an enforceable contract with the insureds at the time of their loss and whether such a contractual agreement invalidated any coverage which Allstate's policy might have provided; whether the insureds complied with the conditions precedent which Allstate establishes under the provision of the policy termed "Requirements in Case Loss Occur"; and whether Grayson's financial settlement with the insured affects or impairs Grayson's right to call on Allstate for Allstate's pro rata share of that settlement.

## III. THE LAW AND THE RULINGS OF THE COURT

The rule of a liberal construction in favor of the insured is applied very frequently to policies of insurance.

The general rule is that terms in an insurance policy which are ambiguous, equivocal, or uncertain to the extent that the intention of the parties is not clear and cannot be ascertained clearly by the application of the ordinary rules of construction are to be construed strictly and most strongly against the insurer, and liberally in favor of the insured, so as to effect the dominant purpose of indemnity or payment to the insured.

43 Am.Jur.2d *Insurance* § 283 (1982), p. 357. (Footnote omitted). The rule of liberal construction in favor of the insured and against the insurer is based on many reasons: The most frequently used rationale is "that an insurance contract, like any written agreement, should, in case of doubt as to the meaning thereof, be interpreted against the party who has drawn it and is responsible for the language employed therein." *Id.* § 284 at 359. (Footnotes omitted). In light of this general rule of contractual construction, the court will use

---

**3.** The plaintiff presented in its Memorandum of Authorities information concerning the settlement of a recent claim in which both the plaintiff and the defendant were involved. The plaintiff attempted to link the facts and procedures used to settle the claim to those of the present case. Variance, however, exists between the instant case and the matter of the recent claim. More importantly, the court is of the opinion that this matter is not relevant to the present case under consideration.

the essence of the rule as a frame of reference by which it examines the issues of and the law applicable to the present case.

The first issue which the court addresses is whether Allstate had a binding contract with the insureds on December 11, 1981, the date on which the insureds' home was totally destroyed by fire. The record shows that Allstate offered and the insureds accepted by means of their payment of the appropriate premium, an insurance contract which went into effect on November 18, 1980. The insurance contract provided for the following policy coverages and limits of liability: dwelling coverage ($60,000); appurtenant private structures coverage ($6,000); unscheduled personal property coverage ($30,000); and additional living expenses coverage ($12,000). The policy period specified on this insurance contract was "November 18, 1980, with no fixed date of expiration." (Exhibit D–8). Allstate sent a renewal notice to the insureds before the premium-period renewal date of November 18, 1981. It made an offer that the insured's policy of November 18, 1980, be amended by increasing the limits of liability under the policy's coverages and by increasing the premium appropriate to such coverages. The insureds, however, never paid the designated premium. Nor did they intend to renew their insurance contract with Allstate.

 Thus, the insureds never accepted the offer to renew their insurance contract with Allstate. The Virginia Supreme Court discusses the formation of a renewal contract, for example, in *Aetna Casualty Company v. Harris*, by writing: "It is essential to the creation of a contract of insurance that there be an offer or proposal by one party and an acceptance, express or implied, by the other. A renewal contract of insurance must also have these essentials, such as mutual assent and a new consideration." 218 Va. 571, 239 S.E.2d 84, 86 (1977). (Footnote omitted).

In essence, the plaintiff is mistaken by alleging in its pleadings that Allstate's pro-posed contract of renewal was binding at the time of the insureds' loss. Furthermore, the pro rata share of the financial settlement which the defendant is alleged to owe cannot be based on the limits of liability designated under the coverages of that nonexecuted contract. In other words, "[A] mere offer to renew the policy, ... in order to bind the insurance company, must be accepted before a loss thereunder has occurred." 43 Am.Jur.2d *Insurance* § 444 (1982), p. 510. (Footnote omitted).

The record shows that on December 7, 1981, Allstate mailed to the insureds a notice of cancellation for nonpayment of premium: That notice informed the insureds that the insurance afforded by their policy of November 18, 1980, would be terminated at 12 noon on December 26, 1981. (Exhibit D–3). Allstate contends, however, that its policy was not in effect on December 11, 1981: It bases its argument on the premises that the insureds procured by means of substitution an insurance policy with Grayson and that they never honored their contractual obligation with Allstate by paying their premium for continued coverage. (Defendant's Brief at 9–13).

 Generally, the cancellation of a liability policy is an act which operates prospectively and, unlike rescission, does not destroy the policy *ab initio*. Furthermore, "[t]he cancellation of an insurance policy does not affect rights which have already accrued under the policy in favor of the insured ...." 43 Am.Jur.2d *Insurance* § 454 (1982), p. 386. (Footnote omitted).

Usually, a policy of fire insurance contains provisions both for the cancellation of the policy upon request of the insured and for the cancellation by the insurer by a notice to the insured for a prescribed period. In some jurisdictions, "such provision for cancellation upon notice is authorized by statutes ..., either specifically or as a provision of an adopted standard form of policy." 43 Am.Jur.2d *Insurance* § 387 (1982), p. 455. (Footnote omitted). *See e.g.:* Va.Code § 38.1–366, as amended.[4]

---

**4.** The Code of Virginia § 38.1–366, as amended, states that every fire insurance policy shall con-

■ The provisions of a contract of fire insurance set the limits of both the form and sufficiency of a notice of cancellation. They are subject, of course, to statutory provisions concerning notice, which are for the benefit of the insured. *See e.g.:* Va. Code § 38.1–371.2, as amended.[5] Thus, "[f]or a notice to an insured to be the basis of a cancellation of an insurance policy it must positively and unequivocally indicate ' * * * to the insured that it is the intention of the company that the policy shall cease to be binding as such upon the expiration of the stipulated number of days from the time when its intention is made known to the insured.' " *Reserve Life Insurance Company v. Peavy,* 95 Ga.App. 195, 97 S.E.2d 542, 544 (1957). (Citations omitted). *See also: DiProspero v. Nationwide Mutual Fire Insurance Company et al.,* 30 Conn.Sup. 291, 311 A.2d 561 (1973); *Chambers v. Washington National Insurance Co.,* 66 Ga.App. 509, 17 S.E.2d 899 (1941).

The record shows that the insureds' November 18, 1980, policy with Allstate is a standard policy containing the provisions required by the Code of Virginia. The policy does not provide for automatic termination of the insurance either upon default in the payment of a premium or upon the procurement of a substitute policy of fire insurance. Indeed, the policy provides to the contrary: Paragraph A of the Amendment of Cancellation and Suit Provisions states that "[t]his policy may be cancelled by Allstate at any time during the policy period for failure to pay any premium when due ... by mailing or delivering to

the Insured written notice *stating when, not less than ten days thereafter, such cancellation shall be effective."* (Exhibit D–8). (Emphasis added).

■ The defendant urges that the payment of the premium was a condition precedent to continued coverage, and the failure to pay terminated coverage. The court finds nothing in the insurance contract to support this view: Allstate's contract provides that to cancel upon nonpayment of premium the insurer must give a ten days' written notice. Thus, unless the insureds waived this provision of cancellation (which act is not present in the record), the written notice was a condition precedent to the cancellation of the November 18, 1980, policy. *Baysdon v. Nationwide Mutual Fire Insurance Company et al.,* 259 N.C. 181, 130 S.E.2d 311, 317 (1963). In other words, the duration and termination of risk under a contract of insurance "depend upon the agreement of the parties with respect thereto and not upon the time of the payment of the premium." *Boone v. Standard Accident Insurance Company of Detroit et al.,* 192 Va. 672, 66 S.E.2d 530, 536 (1951). (Citations omitted).

To sustain its argument that the insureds' policy was not in effect at the time of their loss, Allstate also relies upon the doctrine of cancellation by substitution: That is, the insureds did not intent to continue their Allstate policy in force, but intended to replace (and, in fact, did replace) that policy with the Grayson policy.

tain 172 standard lines of which lines 56 through 65 are termed "Cancel of Policy" and state:

This policy shall be cancelled at any time at the request of the insured .... This policy may be cancelled at any time by this Company by giving to the insured a five days' written notice of cancellation with or without tender of the excess of paid premium above the pro rata premium for the expired time, which excess, if not tendered, shall be refunded on demand.

5. The Code of Virginia § 38.1–371.2, as amended, states in pertinent part:

(a) Notwithstanding the provisions of § 38.-1–366, no policy or contract of fire insurance

only ... shall be terminated by an insurer by cancellation except upon written notice for one of the following reasons only:

(1) Failure to pay the premium for the policy when due;

\* \* \* \* \* \*

... A written notice of cancellation of or refusal to renew such policy or contract of fire insurance only ... shall:

(1) State the date upon which the insurer proposes to terminate the policy or contract;

(2) State the specific reason or reasons of the insurer for terminating the policy or contract.

"Early authority held that the procurement of new insurance to commence before the expiration of existing insurance without an intent to acquire additional insurance constituted a voluntary cancellation by the insured.... Recent decisions, however, reject the view that merely taking out new insurance on property already insured, in and of itself, acts as a cancellation of the prior policy." *New Hampshire Insurance Company v. Cruise Shops, Inc.*, 67 Misc.2d 60, 63, 323 N.Y.S.2d 352, 355 (1971). (Citations omitted). *See also: Baysdon v. Nationwide Mutual Fire Insurance Company et al.*, 130 S.E.2d at 317; 43 Am.Jur.2d *Insurance* § 414 (1982), p. 482; Annot., 3 A.L.R.3d 1072, 1074–1076 (1977 and Supp.1983).

In light of these recent decisions, the court is of the opinion that cancellation had not become effective at the time the insureds' loss occurred: Thus, the defendant cannot use the doctrine of cancellation by substitution as a defense. Stated another way, even though the insureds obtained other insurance with the intent that it replace and not add to the original coverage, " '[a]n intention to cancel a policy does not *ex proprio vigore* cancel it. \* \* \* ' " *New Hampshire Insurance Company v. Cruise Shops, Inc.*, 323 N.Y.S.2d at 355. (Citation omitted).

Even though the insureds had obtained substitute coverage, they neglected to cancel effectively their policy with Allstate. Even though Allstate could have mailed the written notice on November 28, 1981,[6] and terminated the policy immediately, it failed to comply with the requirements of cancellation expeditiously. It may seem unfair that the insureds' oversight and the insurer's delay might inure to the benefit of the insureds.[7] "The notice of cancellation rule is, however, so important for the insured's own protection, that it has been and should be consistently enforced.... Even where the insured does intend to cancel the policy, and is in the process of obtaining substitute coverage, notice is required to fix the date when the old policy will terminate .... [I]n the technical realm of insurance law, the notice rule is a fixed point on which both insureds and insurers have relied, may rely, and should be able to continue to rely." *Providence Washington Insurance Co. v. Security Mutual Insurance Company et al.*, 35 N.Y.2d 583, 586, 364 N.Y.S.2d 479, 482, 324 N.E.2d 134, 136 (1974). (Citation omitted).

The second issue which the court considers is whether Grayson, the second insurer, had an enforceable contract with the insureds at the time of their loss, and, if so, whether such a contractual agreement invalidated any coverage which Allstate's policy might have provided. The record shows that Grayson offered and the insureds accepted by means of their payment of the appropriate premium an insurance contract which went into effect on November 23, 1981. The insurance contract provided for a three-year term and for the following policy coverages and limits of liability: dwelling coverage ($80,000); appurtenant private structures coverage

---

6. The notice sent to the insureds provided for a nineteen-day extension from the date of mailing before the coverage under the old policy would terminate. Even if Allstate by applying the same extension-term, had mailed the notice either on November 23, 1981 (pursuant to the requirements under Virginia law), or on November 28, 1981 (pursuant to the requirements under its own policy), the old policy still would have been in force on the day of the insureds' loss.

7. The defendant claims that it should not be penalized because it did not comply strictly with the procedures of cancellation under Virginia law. Its contention is that since the insureds had procured other insurance, they did not experience a lapse in coverage at the time of their loss. It supports its claim by citing *Hartford Accident and Indemnity Company v. Fidelity and Guaranty Insurance Underwriters, Inc.*, 223 Va. 641, 292 S.E.2d 327 (1982). The *Hartford* case raised a question of first impression by the Virginia Supreme Court: Their decision rests upon their impression of the legislative intent concerning the statutory scheme of the Workman's Compensation Act and the requirements of the extension of time under an employer's insurance coverage. This court is of the opinion, however, that the *Hartford* ruling is not applicable to the law governing the present case.

($8,000); unscheduled personal property coverage ($40,000); and additional living expenses coverage ($16,000).

The policies of both Allstate and Grayson have an "other insurance" provision which provides against the existence or procurement of other or additional insurance upon the property insured. Their contents being similar, the "other insurance" provision of Allstate's policy states, for example: "Other insurance covering the described dwelling building (except insurance against perils not covered by this policy) is not permitted." (Exhibit D–8 at 8). *See also:* Va. Code § 38.1–666, as amended.[8]

Furthermore, the policies of both insurers have an "apportionment" clause. Their contents again being similar, the "apportionment" clause of the Allstate's policy states, in pertinent part: "(a) Loss by fire ...: Allstate shall not be liable for a greater proportion of any loss from any peril or perils included in this policy than (1) the amount of insurance under the policy bears to the whole amount of fire insurance covering the property, or which would have covered the property except for the existence of this insurance, whether collectible or not, and whether or not such other fire insurance covers against the additional peril or perils insured hereunder: nor (2) for a greater proportion of any loss than the amount hereby insured bears to all insurance whether collectible or not, covering in any manner such loss, or which would have covered such loss except for the existence of this insurance." (Exhibit D–8 at 8). *See also:* Va.Code § 38.1–366, as amended.[9]

These provisions appear ambiguous and conflicting: In fact, "[s]ome such provisions ... have been held invalid, especially where such multiple clauses are held to be mutually repugnant." 44 Am.Jur.2d *In-*

*surance* § 1270 (1982), p. 211. (Footnotes omitted).

This court does not hold that these provisions are invalid. To do so would mean that both policies are unenforceable and neither insurer is liable. This conclusion would be reached even though the issuance of the second policy may not increase the risk hazard. In essence, such a rule would be arbitrary, harsh, inequitable, and unreasonable.

The court again stresses that the rule of liberal construction in favor of the insured will be applied to the provisions and issues concerning other or additional insurance. Thus, the court will consider the construction of the insurance contract as a whole: "[T]he policy must be construed, not in the light of the insurer's understanding of it, but rather in the light of the interpretation which others may place on it, in view of the usages of the business, and under the rule that any ambiguity must be resolved against the insurer." 43 Am.Jur.2d *Insurance* § 1095 (1982), p. 1108. (Footnote omitted).

The record shows that even though Grayson's agent did not know the specific terms of termination, he had notice of the existence of the Allstate policy before Grayson issued its policy with the insureds. Thus, the court is of the opinion that because of such notice, Grayson waived the "other insurance" provision under its policy and is estopped from setting up any breach of its insurance contract. *Fire Ass'n. of Philadelphia v. Hogwood*, 82 Va. 342, 4 S.E. 617 (1887); *Pacific Fire Ins. Co. v. Bowers* 163 Va. 349, 175 S.E. 763 (1934); *New Hampshire Insurance Company v. Cruise Shops, Inc.*, 67 Misc.2d 60, 323 N.Y.

---

**8.** The Code of Virginia § 38.1–366, as amended, states at lines 25 through 27: "Other Insurance. Other insurance may be prohibited or the amount of insurance may be limited by endorsement attached hereto."

**9.** The Code of Virginia § 38.1–366, as amended, states at lines 86 through 89: "Pro Rata Liability. This Company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insur-

S.2d 352. *Cf. Sutherland v. Old Dominion Insurance Co.,* 72 Va. (31 Gratt.) 176 (1878).[10]

■ The defendant contends that since Grayson's policy was valid and enforceable at the time of the insureds' loss, the "other insurance" clause in Allstate's policy was enforceable. (Defendant's Brief at 14–15; Defendant's Reply Brief at 3–4). To support its claim, Allstate relies upon the purpose of the "other insurance" clause in an insurance contract: "Such a provision is designed to check the fraud or carelessness resulting from overinsurance, and has been generally established by the courts as a reasonable and valid provision, ... even though the policy does not provide that such violation will avoid it." 44 Am.Jur.2d *Insurance* § 1270 (1982), pp. 209–210. (Footnotes omitted).[11]

At first blush, it would appear that the defendant's claims of breach and overinsurance on the part of the insureds are sound. The record and the law, however, will show the contrary.

The record shows that before entering into negotiations with the Grayson's agent, the insureds had not renewed their contract with Allstate, nor had they received Allstate's contractual notice of cancellation for nonpayment of the premium. It is a reasonable deduction from the record that because of nonpayment of a premium and of no contractual notice of cancellation, the insureds believed that they had no insurance on their home at the time they applied

for the Grayson policy, and that they needed the protection of fire insurance. Because they were unaware of the existence of the Allstate policy, "the moral hazard [or risk of intentional damage] was not increased and the reason for the stipulation against other insurance ceased." *American Insurance Company v. Kelley,* 160 Tex. 71, 76, 325 S.W.2d 370, 373 (1959). In other words, "[i]f the increase in the risk, then, is the only real basis for holding non-liability, it is somewhat difficult to justify the rationale in voiding liability on the first policy where the second [policy] is valid." *American Insurance Company v. Kelley,* 160 Tex. 71, 76, 325 S.W.2d 370, 373 (1959).[12]

"Furthermore, a condition against overinsurance is not violated by the issuance of a renewal policy which the insured had not accepted or paid for or promised to pay for, although he made a claim under it in order to protect any rights which he might have." 44 Am.Jur.2d *Insurance* § 1283 (1982), p. 222. *See also: Home Insurance Co. v. Shriner,* 235 Ala. 165, 177 So. 890 (1937) (in which the court held that a fire insurance policy, cancelled by substitution of another policy for it, does not constitute additional insurance invalidating other policies). Thus, this court finds that since no provision in the Allstate policy clearly and unambiguously relieved it of liability if the insureds procured other insurance, the Allstate policy was not breached when the insureds procured the Grayson policy.

ance covering the property against the peril involved, whether collectible or not."

**10.** The *Sutherland* Court held in this case of first impression that a condition in the first policy, stating that the policy should be void if the insured obtained other insurance without the written consent of the company, related only to other valid insurance and that if the second policy is inoperative at the time of the loss so that the insureds cannot maintain an action upon it, then the "other insurance" condition of the first policy is not enforceable. The *Sutherland* rule is not applicable to the present case. (This rule later was questioned by the Virginia Supreme Court in *New Brunswick Fire Ins. Co. v. Morris Plan Bank,* 136 Va. 402, 405–406, 118 S.E. 236, 237 (1923)).

**11.** The Virginia Supreme Court in the *Morris Plan Bank* case expressed the need to enforce the "other insurance" provision in these terms:
 A sound public policy requires the enforcement of such a condition. The overinsurance of property increases the moral hazard, and its inevitable tendency is to increase the rates imposed for insurance up on those who do not overinsure their property. This is an evil against which the companies have a right to protect themselves, and in which the insuring public has a very substantial interest.
 *Id.*

**12.** The court does not go so far as to say that under any and all circumstances the issuance of an invalid or a valid second policy will not necessarily void the first policy. The court does not reach or pass upon that question.

 Accordingly, the court concludes that an overlapping coverage existed between the two policies held by the insureds at the time of their loss. In such a circumstance, equity and justice mandate that the plaintiff and the defendant be regarded as co-insurers for the loss.[13] Consequently, the court must apply the general

---

**13.** Although the court already has reached the decision that the two companies shall be regarded as co-insurers for the insureds' loss, it briefly will comment on the third issue discussed by both parties to the suit: namely, whether the insureds failed to comply with the conditions precedent which Allstate establishes in case a loss occurs, or in the alternative, whether Allstate waived its rights concerning such requirements. An analysis of the record and the applicable law to this issue will show, again, that the two insurers have a joint obligation on the loss.

The defendant contends that the insureds breached the Allstate policy's provisions concerning the requirements in case of a loss and the time of paying a loss by not providing the defendant with an immediate notice of their loss, with a sworn proof of loss, and with an itemized inventory of the property damaged or destroyed in the fire. (Exhibit D–8 at 2; *see also:* Va.Code § 38.1–366, as amended). The defendant also alleges that the insureds expressly advised Allstate that they did not intend to make a claim against Allstate (Defendant's Brief at 18; Defendant's Reply Brief at 2), and that even though the plaintiff knew of the defendant's potential involvement in the insureds' matter in December of 1981, the plaintiff, by means of its letter of April 9, 1982, did not notify the defendant of its intent to make a claim against the defendant until April 14, 1982. (Defendant's Brief at 19; Defendant's Reply Brief at 2).

The record shows both affirmations of and contradictions to the defendant's allegations. On the other hand, it reveals: That Allstate had been aware of the insureds' loss even before the insureds were; that on its own initiative, it opened a claim file on the insureds' matter; that it recommended but never demanded performance of its contractual requirements on the part of the insureds; and that the insureds personally did not perform the conditions precedent set by Allstate's insurance contract, but Grayson did give Allstate notice of an intent to make a claim against Allstate.

On the other hand, the record discloses that the insureds never expressed either to Allstate's agent, Mrs. Haga, or to any other Allstate agent that they did not intend to make a claim against Allstate. More specifically, the record shows that once the defendant learned about the insureds' insurance contract with the plaintiff, it acted out through its agents a reliance on the doctrine of cancellation by substitution: first by assuming no filing of a claim by the insureds (Deposition at 38); next by advising a plaintiff's agent of the defendant's cancellation of the insureds' policy (Deposition at 94–95, 136); then by closing its claim file with the insureds' matter and cancelling the reserves on this loss (Deposition at 132–133, 139), and finally by writing on a Regional Office document "[A]t present no claim being made against [the Allstate] policy by [the insureds] and no volunteering of same." (Deposition at 119–120, Exhibit P–5). The agents' acts all occurred before December 26, 1981, the fixed date of termination of the insureds' policy with Allstate. They collectively imply that the defendant denied liability for the insureds' loss on the basis of the doctrine of cancellation by substitution and that the defendant did not volunteer (or refused) to pay for that reason.

This court notes, as did the *Maynard* Court, that "'[P]roofs of loss are no part of a contract of fire insurance, nor do they create the liability to pay a loss; they serve to fix the time when it becomes payable, and when an action may be commenced to enforce a liability.'" *Maynard v. National Fire Insurance Company of Hartford,* 147 W.Va. 539, 552, 129 S.E.2d 443, 453 (1963). (Citations omitted).

The *Maynard* court also held that the provisions of an insurance contract concerning the requirements of proofs of loss are for the benefit of the insurer and may be waived by it or by its duly authorized agent. *Id.* 129 S.E.2d at 448–450. *See also: West Rockingham Fire Ins. Co. v. Sheets & Co.,* 67 Va. (26 Gratt.) 854, 864–865 (1875); *Eden Corporation v. Utica Mutual Insurance Company et al.,* 350 F.Supp. 637, 642–643 (W.D.Va.1972). *See generally:* 10 B Michie's Jur. *Insurance* §§ 210–212 (1977, Supp. 1983), pp. 286–291. This court stated in the *Eden Corporation* case that "'the burden of proving compliance with the necessary requirements of an insurance policy as to proofs of loss, or the waiver of such compliance, is on the insured; and if he fails to establish the same by a preponderance of evidence, his action must fail.'" *Eden Corporation v. Utica Mutual Insurance Company et al.,* 350 F.Supp. at 643. (Citations omitted).

Based on the record and the law applicable to the present case, the opinion of the court is: that the defendant was bound by the acts of its duly authorized agents; that, having been informed of the insureds' loss and of their procurement of an insurance contract with the plaintiff, the defendant decided that upon the specific ground of cancellation by substitution (which was independent of any demand for proofs of loss), its own contract with the insureds was not valid; and that consequently the defendant waives all objection to the insufficiency of these proofs and is estopped to rely upon a failure to furnish such formal proof of

rule favoring pro rata liability.[14] *New Hampshire Insurance Company v. Cruise Shops, Inc.*, 67 Misc.2d 60, 323 N.Y.S.2d 352 (1971); *Lee v. Ohio Casualty Insur-*

loss in this cause of action. In other words, " '[t]he refusal to recognize the existence of any claim, or a general refusal to pay, renders the delivery of notice and proofs a useless ceremony, and is treated as waiving a strict compliance with the condition as to preliminary notice and proofs, both in respect to form and time.' " *West Rockingham Mutual Fire Ins. Co. v. Sheets & Co.*, 67 Va. (26 Gratt.) at 864–865.

Furthermore, on the basis of two other grounds, the court concludes that the defendant's contention of a contractual breach by the insureds is without merit. The first ground is that, the insureds' loss being total, this court concurs with "other authorities supporting the proposition that [in the absence of an insurer's demand for detailed proofs of loss,] no proof of loss is necessary in a case of total loss by fire." *Maynard v. National Fire Insurance Company of Hartford,* 129 S.E.2d at 454. (Citations omitted; *see e.g.: Prudential Fire Ins. Co. v. Alley,* 104 Va. 356, 51 S.E. 812 (1905)).

The second ground is that since the court regards both the plaintiff and the defendant as co-insurers of the loss, a statute of the Code of Virginia pertaining to insurance contracts issued by two or more companies is considered applicable to the instant case. Specifically, Va. Code § 38.1–372(b), as amended, states: "That service of process upon, or notice of proof of loss, required by the policy and given to any of the insurers executing the policy, shall be deemed to be service upon or notice to all such insurers." In essence, when the insureds met the conditions precedent set by the plaintiff's insurance contract, they exercised with due diligence their contractual obligations with the defendant.

14. *Both parties to this suit apply the term "subrogation" to their respective positions. In the third paragraph of its pleadings, for example, the plaintiff uses the expression "the plaintiff ... has been subrogated by the named insureds to all of [sic] their rights against any party jointly or severally liable for said loss."* (Plaintiff's Motion for Judgment at 2). The defendant alleges that because the plaintiff acted as a volunteer when it paid the insureds the total amount of the final settlement, it violated the "apportionment" clause of its own insurance contract and therefore is not entitled to be subrogated to the insureds' rights against the defendant. (Defendant's Brief at 23–26). In other words, the defendant argues that "[i]f one, without legal obligation or compulsion to do so, makes a voluntary payment, he is not entitled to be subrogated to the payees [sic] rights and remedies against third parties." (Defendant's Brief at 26). (Citations omitted).

The use of the term "subrogation" may be confusing or misleading. On the one hand, "subrogation is a normal incident of liability or indemnity insurance, and the doctrine is clearly applicable where the policy contains the ordi-

nary subrogation clause. ... [On the other hand,] the doctrine of subrogation is inapplicable ... if the effect of the respective policies was to establish equal liability." 44 Am.Jur.2d *Insurance* § 1800 (1982), pp. 791–792. (Footnotes omitted). In *Kenner v. Century Indemnity Co.,* 320 Mass. 6, 67 N.E.2d 769 (1946), for example, the court held that if the policies of each insurer provided coverage and each policy contained "other insurance" provisions, then an insurer had no right of subrogation against another insurer for liability. As the court reasoned and concluded:

"If the subrogation clause of either policy applied to other insurance, each insurer would be entitled to subrogation against the other, and subrogation would become a futility .... There is no room for the application of the subrogation clause between the insurers, and a correct result is reached if the amount payable ... and covered by both policies is simply charged against the companies in the proportions required by the "Other Insurance" provision found in both policies." *Kenner v. Century Indemnity Co.,* 67 N.E.2d at 774.

This court reaches a similar conclusion. It considers the term "subrogation" used in the instant case as a technical misnomer: The mere fact of a technical misnomer will not prevent the plaintiff from recovery.

The court bases its conclusion on at least three reasons. First, the plaintiff's intent of this suit is to collect the pro rata share of the loss for which the defendant is obligated. By stating this intent in its Motion for Judgment, the plaintiff met the general requirements of pleadings and motions, pursuant to Rules 7 and 8 of the Federal Rules of Civil Procedure.

Second, the court considers that since both companies insured the same risk and interest or had a common liability upon the same obligation, they actually become subrogated to each other's right of contribution. The court bases its view on the definition of the term "subrogation": "Subrogation is of the kinds, either *conventional* or *legal; the former being where the subrogation is express, by the acts of the creditor and the third person; the latter being (as in the case of sureties) where the subrogation is effected or implied by the operation of the law.*" Black's Law Dictionary 1596 (4th ed. 1968). (Citations omitted) (Emphasis in original).

Third, since the companies were co-insurers of the same risk and interest and the insureds substantially complied with the provisions of their contract concerning a case of loss by fire, the court concludes that pursuant to the Va. Code § 11–13, as amended, the plaintiff's financial settlement with the insureds does not affect or impair its right to call on the defendant for the defendant's pro rata share of that settlement. In other words, the Virginia statute "carefully preserves the rights of all parties,

*ance Company,* 58 Ill.App.3d 1, 15 Ill.Dec. 555, 373 N.E.2d 1027 (1978); *Songer v. State Farm Fire and Casualty Company,* 91 Ill.App.3d 248, 46 Ill.Dec. 715, 414 N.E.2d 768 (1980). *See also:* 43 Am.Jur.2d *Insurance* § 414 (1982), p. 482.

The record shows that coverage limits of liability provided by the Allstate policy totalled $108,000, that those provided by the Grayson policy totalled $144,000, and that the final settlement of the insureds' claim totalled $100,213.78. (Exhibit D–4). Based on the apportionment provisions of the co-insurers' policies, Grayson's pro rata share of that settlement is $57,121.85 and Allstate's pro rata share is $43,091.93.[15]

■■■ Thus, the court is of the opinion that the plaintiff has the equitable right of contribution and the defendant must pay its ratable proportion of the claim.

[A]s ... Mr. Lile, in his notes on Equity Jurisprudence, says: "When one surety pays more than his share of the debt, he calls upon his co-surety for contribution—that is, he demands that the co-surety shall help to bear the common burden." The general principles of contribution have been stated in the following language:

"The right to contribution does not arise out of any express contract or agreement between the parties to indemnify each other, but on the broad princi-

ples of equity which courts of law enforce that where two persons are subject to a common burden it shall be borne equally between them.... [Other authorities also hold] that:

" 'The right of one surety to call upon his co-surety for contribution arises from a principle of equity growing out of the relation which the parties have assumed towards each other; the equity springs up at the time of entering into that relation, and is fully consummated when the surety is compelled to pay the debt.' "

*Houston et al. v. Bain,* 170 Va. 378, 196 S.E. 657, 662 (1938). (Citations omitted). *See generally:* 17 Am.Jur.2d *Contracts* § 298 *et seq.* (Cum.Supp.1982 and 1983). *Supra* note 14.

## IV. CONCLUSION

The decision of the court, which is based on the principles of equity and justice and on the rationale stated above, is that the two companies shall be regarded as co-insurers and that since the plaintiff paid the whole of the claim, it shall recover from the defendant the ratable proportion of the claim that each ought to pay. Therefore, it is ORDERED that the plaintiff's motion for summary judgment is granted and that the defendant shall pay the plaintiff a judgment in the amount of FORTY–THREE THOUSAND NINETY–ONE and 93/100 ($43,091.93) DOLLARS with interest from May 28, 1982; and the costs of this proceeding.

provides against the increase of anyone's burden, and strictly guards all the equities between co-obligors as well as between contracting parties." *Yuille v. Wimbish,* 77 Va. 308, 314 (1883). *See also: Penn v. Bahnson,* 89 Va. 253, 15 S.E. 586 (1892), in which the doctrine of the right of contribution between joint contractors and co-obligors was applied.

In summary, by examining the third and fourth issues raised by the parties to this suit, the court still reaches the same conclusions expounded in the text of the opinion: The court holds that the plaintiff has the equitable right of contribution and the defendant must pay its ratable proportion of the claim.

**15.** Both parties to the suit made computational errors that related to the ratable proportion of the claim that each ought to pay. On the one hand, the plaintiff used the renewal contract of

Allstate as its basis to determine the total amount of coverage limits of liability on the insureds' property. The plaintiff alleged in its Motion for Judgment that the defendant's ratable proportion of the claim was $46,776.48: A recalculation of what is termed the "1981 base" shows, however, that if the renewal contract were, in fact, enforceable, the defendant's ratable proportion of the claim would be $47,100.48.

On the other hand, the defendant used the Allstate contract of November 18, 1980, as its basis to determine the total amount of coverage limits of liability on the insureds' property. The defendant stated in its Brief (at 25) that its ratable proportion of the claim was $42,948.77: A recalculation of what is termed the "1980 base" shows, however, that the defendant's ratable proportion of the claim is $43,091.93.